KENNEDY, Justice.
Plaintiff, Ruben Chapa, Jr., appeals from a judgment entered after a jury returned a verdict for the defendant as to proximate causation. On plaintiffs motion, a directed verdict for plaintiff was granted as to the issue of negligence. The litigation arose out of an automobile-truck accident that occurred in December 1986, while Chapa was employed by the City of Mobile. At the time of the accident, Chapa was driving a city-owned dump truck. The truck was struck from the rear by an automobile being driven by Annie L. Williams. Chapa filed suit, alleging negligence and wanton and reckless conduct.
The question presented is whether the trial court erred in overruling the plaintiffs motion for a mistrial based upon defense counsel’s references to the plaintiffs pre-accident psychological evaluations and to the workmen’s compensation carrier.
The directed verdict finding the defendant negligent is not at issue in this appeal.
On October 26, 1988, plaintiff filed a motion in limine, requesting the trial court to instruct the defendant and counsel to refrain from arguing, testifying, or presenting to the jury (1) that plaintiff’s complaints as to his injuries were motivated by secondary gain, the pendency of a lawsuit, or the prospect of settlement of this claim, and (2) any matters in plaintiff’s personnel file not relevant to the issues framed by this lawsuit, specifically documents or other materials involving the workmen’s compensation carrier or employees of the City of Mobile, and reports to and from examining or treating physicians, to the City, to the workmen’s compensation carrier, or to other parties. The record is not clear as to the trial court’s ruling on this motion. Chapa maintains that the court’s actions and instructions during the trial indicate that there was a favorable ruling on both elements of the motion, but that during the course of the trial, defense counsel disregarded the court’s instruction and made several statements and asked questions regarding the matters set out in the motion.
Plaintiff asserts that the following exchanges violated the pretrial ruling and were prejudicial to his case:
1. During defense attorney Killion’s opening statement to the jury:
“MR. KILLION: Well, in ’83 Dr. Ray is making that diagnosis of him. The evidence is going to show you, ladies and gentlemen, that finally Dr. Ray couldn’t find anything wrong with him. That’s when he asked that a psychiatrist and a psychologist come in.
“MR. BRISKMAN: Judge, I object to this. The Court has ruled on that particular issue regarding this issue in 1983.
“MR. KILLION: On one issue of the testimony, is my understanding, Judge. I’m not going to get into that. Not that I can’t say that he didn’t see these doctors.
“THE COURT: Go ahead. Overrule. That he saw them, but don’t go into what they said. (Mr. Killion continued his closing statement during which the following occurred:)
“MR. KILLION: Finally, he goes and sees Dr. Fletcher at the request of a comp carrier.
“MR. BRISKMAN: Judge, I object as to that.
“THE COURT: Sustain.
“MR. BRISKMAN: May I approach the Bench?
“THE COURT: Yes.
“(Bench:)
“MR. BRISKMAN: Judge, Mr. Killion has done everything he can to inflame this jury in terms of things that are collateral. He knows better than that.
“THE COURT: There’s no comp carrier involved.
“MR. BRISKMAN: It’s not before this jury, and he knows it. It has been my understanding that the practice before *1040 this Court is that the injection of that is not to be before this jury.
“THE COURT: That’s correct.
“MR. BRISKMAN: And based on that, we move for a mistrial.
“THE COURT: Denied. If you go into anything like that again, I will declare a mistrial. I don’t think I should try to correct this by telling them to disregard it; do you or you want me to? It’s just up to you.
“MR. BRISKMAN: Not at this point.”
2. During cross-examination of Ruben Chapa:
“Q. All right. Let’s talk about Dr. Davis. Dr. Davis is a clinical psychologist; isn’t he?
“A. I didn’t know that until I got over there.
“Q. Well, you know it now?
“A. Yes, sir.
“Q. You went to Dr. Davis.
“A. Sure.
“Q. And Dr. Davis asked you to take some tests; didn’t he?
“A. Dr. Davis didn’t ask me anything, sir. His nurse did.
“Q. His nurse asked you to take some tests?
“A. Yes, sir.
“Q. And you refused to take those tests; didn’t you?
“A. No, sir. I just told her that — I said, you know, take a look at me, you know. I said I don’t need anything done to my head.
“Q. Well, the point is she asked you to take some tests and you wouldn’t take them; would you?
“A. No, sir; I didn’t take them.
“Q. All right, sir. Matter of fact, you had taken tests similar to that before; had you not?
“A. Yes, sir; I did.
“Q. Do you know Dr. Thomas Bennett, Dr. T.S. Bennett?
“A. Sure do.
“Q. And he administered to you the same psychological tests.
“MR. BRISKMAN: Judge, I’m going to object to this.
“A. I don’t know if it would be the same tests, sir.
“MR. BRISKMAN: Excuse me. If the Court, please, I’m going to object to this line of questioning. I suggest that this involves matters that are not related to this particular accident.
“THE COURT: Sustain the objection.
“MR. KILLION: Judge, could we have a sidebar a minute about that issue before we go any further[?]
“(Bench:)
“THE COURT: I will let you go fully into any secondary gain connected with this second accident. I’ll let you show the first accident and all the injuries he had. The psychological tests in that one [are] just too prejudicial.
“MR. GILLIS: The point is that he had been given these same tests before and he knew what the results showed the first time and that was his motive for refusing to take them the second time.
“THE COURT: I’ll let you ask that. Just’ don’t go into the results of it.
“MR. BRISKMAN: Judge, he can show that he saw Bennett and that tests were run. If Lucian’s next question is going to be, did you learn what the results of that test were and if he says no, that ends it. If he says yes, that ends it. I don’t want to be put in a position where I’m standing up objecting all the time on stuff this Court has previously ruled on.
“MR. KILLION: I understand, Judge. The only thing is this is going toward motive and intent as to why he is not getting better. And this shows a pattern.
“THE COURT: I’m going to let you show the accident. That’s going probably as far as Alabama law will let me go. I’ll let you go into anything on this second one.”
3. During the reading of direct examination deposition- testimony of Dr. J.B. Ray:
“Q. So he was in the hospital from August 20, 1984, until September the 26th, over a month?
*1041 ‘A. That’s what it sounds like.
'Q. All right, sir. When did you next see him?
'A. Broke an appointment on 20 November, ’84. Broke an appointment on 27 November, ’84. Returned 29 November, ’84. He said he was doing quite a bit better since his hospitalization and since the work at the Rotary Rehab Center.... We indicated that he should seek his future medical treatment elsewhere and we will be happy to report what we have to whomever he will release it — whomever he will release it to with proper release and written request. We need to send a report of today’s visit on Mr. Chapa to Dr. George Davis and to Dr. Thomas Bennett.
‘Q. Who are Dr. George Davis and Dr. Thomas Bennett?
‘MR. BRISKMAN: Object, if the Court, please.
‘THE COURT: Sustain.
‘MR. KILLION: Leaving page twenty-seven, line twenty-two and going to page thirty, line nine.
‘A. Well, do you want me to read this discharge summary into the record and see if that reveals—
‘Q. Yes, sir, please.
‘A. —a relationship?
“The date of admission was 20 August, ’84. Date of discharge, 26 September, ’84. Laboratory data: Nuclear bone scan was done, which was within normal limits.
‘MR. KILLION: Leaving page thirty-one, line five, going to page thirty-two, line one.
‘A. An electromyelogram of the back was interpreted as negative. Thorazine seemed to help as much as anything. Patient continued to have large problems which were felt by me to be largely on an emotional basis. He was injected in the left gluteal area with Xylocaine and Aristocort. Dr. George Davis was asked to see the patient, who agreed with this approach; the medication. Thorazine was added. The patient continued—
“MR. BROWNING: Judge, they’re getting into the same thing as far as—
“THE COURT: I sustain the objection.
“MR. BRISKMAN: Judge, we’d ask an instruction—
“MR. KILLION: Judge, if I could just show you the next line we intend to read.
“THE COURT: Overrule the objection.
“MR. BROWNING: Judge, before we get into it again, one of his sentences in there is talking about what Dr. Davis had to say. That’s pure hearsay.
“MR. KILLION: Lines nine to thirteen is all we’re going to read.
“MR. BRISKMAN: That includes hearsay, your honor.
“THE COURT: Don’t read what the other doctor said.
“MR. KILLION: Yes, sir.
“Q. In other words, psychological factors were significant in preventing his recovery?
“A. I believe so.
“MR. BRISKMAN: Your Honor has ruled and instructed these lawyers that the only thing they would be allowed to go into in 1983 had to do with the man’s physical condition.
“THE COURT: That’s correct.
“MR. BRISKMAN: And they continue to go beyond that. And we would object.
“MR. KILLION: Judge, this is Dr. Ray giving his opinion. We have not—
“MR. BRISKMAN: May we approach the bench. We have argued this several times.
“THE COURT: Let’s go back in my office.
“MR. BRISKMAN: They’ve been instructed on it three times.
“(In chambers. Off record.)”
4. During the reading of direct examination deposition testimony of Dr. Davis, clinical psychologist:
“Q. Did you conduct any sort of examination or other activity to evaluate Mr. Chapa?
“A. No. He said he did not wish to participate with any kind of formal *1042 psychological studies. He felt that he did not have a psychological problem, these problems were real physical problems. So the report that I wrote then becomes based on our interview.
“Q. All right, sir. What kinds of psychological tests would you have wanted to administer if Mr. Chapa would have cooperated?
“MR. BRISKMAN: Object to the form of the question.
“THE COURT: Sustain.
“MR. KILLION: Page eleven, line four.
“Q. Okay.
“A. And then I would have wanted to have known about his personality and looked at that from — I like" to do it . from three things. One, I form my own opinion as I do here. Then I like to do some of the tests that are objective and I get a computer score on them and see what the computer says. Then I like to give them things that they can mark where they mark various complaints and symptoms that they have so that I can. see what kind of correlation there is between all three of them. I’m most comfortable when we have a very close correlation. My opinion, which is from our observations and interviews is consistent with what the computer says, that’s real nice. And then with what the person themselves say. That’s the type of thing I would have liked to have done.
“A. All right, sir.
“MR. BRISKMAN: Judge, I move to strike that as not responsive to any question. The Court has previously sustained an objection to the form of the question that set that up. The only thing that proceeds that is okay. That is a response to the question that Your Honor sustained the objection to,
“THE COURT: Overrule. I think it’s all part of the answer to the prior question.”
5. During the reading of direct examination deposition testimony of Dr. Raymond Fletcher:
“MR. KILLION: Skipping down to line nineteen. .
“Q. All right.
“A. And one other thing is it seems that his treatment would be a lot easier once his settlement is — you know, once he has a settlement, whatever it is.
“MR. BROWNING: Judge, we're going to object to this and move to strike the answer.
“MR. BRISKMAN: That’s entirely improper. Wasn’t even a question asked.
“THE COURT: Sustain. There wasn't a question asked.
“MR. KILLION: Going back up on page fourteen, line seven.
“Q. All right, sir. Did you provide any treatment to Mr. Chapa?
“A. No. No treatment was requested.
“Q. Did you make any recommendation for treatment or otherwise?
“A. Yes.
“Q. What was that, please, sir?
“A. I recommended to continue with physical therapy and his current medications. To continue with the TENS unit, which was helpful in controlling his symptoms. To continue follow-up with his physician. And I really had nothing further to add as far as diagnostic studies.
“Q. All right.
“A. And one other thing—
“MR. BROWNING: Judge, this is the same objection that we just had ruled on and sustained.
“MR. KILLION: Judge, I read the question now. And that continues with his answer.
“MR. BROWNING: The objection was sustained because it was a volunteered statement.
“THE COURT: Overrule.
“A. And one other thing is it seems that his treatment would be a lot easier once his settlement is — you know, once he has a settlement, whatever it is.
“Q. Yes, sir. You commented earlier that you felt it was a significant factor in his history that he had been involved in an earlier automobile accident.
*1043 “MR. BROWNING: Judge, could we approach the bench?
“THE COURT: Yes, you can.
“(Bench:)
“MR. BROWNING: Everything they’re talking about is the previous accident in 1983.
“THE COURT: Sustain as to that.
“MR. BRISKMAN: Judge, Your Honor has instructed them in this area. They know that, and they continue to bring it up in front of the jury.
“THE COURT: I don’t want it to happen again.
“MR. GILLIS: Your Honor, may I be heard?
“THE COURT: Yes.
“MR. GILLIS: Your Honor, I understand that the Court has ruled that what was done with relation to the first accident is not admissible here, but this doctor is stating that the first accident has a definite relationship on this man in this accident. And he should be entitled to express that opinion. What he’s saying is that the experience from the first accident makes this man all the more prone—
“THE COURT: I sustain the objection.”
The record reveals the interjection of evidence as to psychological tests conducted prior to the date of this accident. Defense counsel argued that the tests were relevant to a determination of whether psychological factors prevented plaintiff’s recovery from injuries sustained in a prior automobile accident and thus, precipitated Chapa’s refusal to undergo psychological evaluation as a part of his treatment for injuries he sustained in the accident out of which this case arises.
Plaintiff’s counsel objected to each reference to the psychological evaluations and the workmen's compensation insurance carrier and each objection was ruled on by the trial court with limiting instructions given to defense counsel. The Court permitted questioning as to whether the psychological evaluations were conducted but restricted any questions or statements regarding the results of the evaluations.
The issue of whether to grant a mistrial generally rests within the sound discretion of the trial court. “The trial court was present and was an eyewitness to all of the proceedings and in overruling the defendant’s motions [for mistrial and new trial] in effect found that the remarks were not prejudicial.... Therefore, the actions of the trial court ... will not be disturbed by this court unless it affirmatively appears from the entire record that the statements involved were probably prejudicial....” Birmingham Electric Co. v. Perkins, 249 Ala. 426, 430, 31 So.2d 640 (1947), restated in Durham v. York, 269 Ala. 304, 112 So.2d 472 (1959), and British General Insurance Co. v. Simpson Sales Co., 265 Ala. 683, 93 So.2d 763 (1957).
In the present case, the trial court did all it was requested to do. Objections to defense counsel’s references were sustained, and the trial court offered to give curative instructions if the plaintiff’s counsel felt they were needed. Plaintiff’s counsel declined the offer by stating “not at this point.”
A court that does all it is asked to do in sustaining objections to arguments will not be placed in error for failing to do more, unless the argument is so grossly improper and highly prejudicial that its sinister influence cannot be destroyed by the action of the trial court. Ledbetter-Johnson Co. v. Hawkins, 267 Ala. 458, 103 So.2d 748 (1958).
Based upon the admissible medical testimony regarding Mr. Chapa’s injury and condition, we cannot say that the verdict indicates that the jury was moved by prejudice or passion in its determination of the case.
The judgment is due to be, and it is hereby, affirmed.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.